**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | * | |
| SCOTT ALAN SCHELLHAMER and | * | CHAPTER 13 |
| LINDA LEE SCHELLHAMER, | * | |
| Debtors | * | |
| | * | CASE NO. 1:08-bk-01673MDF |
| MICHAEL DAVIS and | * | |
| VERONICA DAVIS, | * | |
| Movants | * | |
| | * | |
| v. | * | Motion for Relief from the |
| | * | Automatic Stay |
| SCOTT ALAN SCHELLHAMER and | * | |
| LINDA LEE SCHELLHAMER, | * | |
| Respondents | * | |

## OPINION

### Background

Before me is the motion of Michael and Veronica Davis ("Movants") for relief from the

automatic stay under 11 U.S.C. §362(d). Movants request relief from the stay to allow them to

proceed with a landlord/tenant action they commenced in state court against Scott and Linda

Schellhamer ("Debtors") before Debtors filed their bankruptcy petition. The background for

their motion is as follows.

Movants and Debtors are parties to a series of three purported agreements regarding a

parcel of real estate (the "Property") located near Millersburg, Pennsylvania. The first and third

agreements were drafted by Movants. The second agreement was drafted by an attorney

representing Movants. The parties disagree about which agreement controls the rights of each

party in the Property.

The first agreement is a "Land Sales Agreement" ("LSA") drafted by Movants and

executed by all parties on August 31, 2006. Debtors argue that under the LSA they are the

equitable owners of the Property and that Movants hold only bare legal title. Debtors further aver that because they provided a substantial down payment on the purchase and made significant improvements to the residence located on the Property, they have generated an "equity cushion" that provides Movants with adequate protection of their interest. Accordingly, Debtors argue that Movants are not entitled to relief from the stay.[1]

The second agreement is a "Lease with Option to Purchase" (the "Lease /Option") drafted by Movants' attorney and executed on December 5, 2006. Movants assert that under the Lease/Option Debtors are only tenants and that because Debtors defaulted on the Lease/Option, under its terms they are merely tenants on a month-to-month basis. Movants assert that they are entitled to relief from the automatic stay to permit them to pursue the eviction action that they filed in state court in April 2008.

Debtors admit that they are required to make monthly payments to Movants and that certain payments have been missed, but they deny that the payments due are "rent." They further aver that Movants expressly waived their rights to payments under the Lease/Option when Movants offered to repurchase the Property and Debtors accepted their offer. Movants' offer to repurchase the Property is contained in an untitled document (hereinafter referred to as the "Written Summary") given to Debtors by Movants on or about October 20, 2007. The Written Summary was intended to restore the parties to the status quo that existed before Debtors acquired an interest in the Property. Under its terms, Movants were to repay Debtors their

---

[1]Debtors' chapter 13 plan proposes to assume the LSA and to pay arrearages through the plan.

$78,000.00 deposit with interest.[2]  They also extended to Debtors the opportunity to rent the Property for two years at $450.00 per month[3] and for three years thereafter at the "fair market value" until the deposit was repaid. Movants also agreed to reimburse Debtors $10,800.00 for the funds Debtors expended to have electrical service installed in the Property.

As I will discuss below,  I find that the LSA is a legally binding contract expressing the parties' agreement that Movants were selling and Debtors were purchasing a fee interest in the Property. The Lease/Option, which was represented to Debtors as merely a legal formalization of the terms of the LSA, was ineffective to terminate that interest. While I find that the Movants offered to restore the parties to the status quo ante through the Written Summary, I further conclude that this agreement is an executory accord that was not performed by either party and thus failed as an accord and satisfaction of the LSA.

## Factual Findings

Debtors and Movants became acquainted through a business operated by Movants, a traveling gun show, at which Debtors occasionally would sell concessions. On April 4, 2006, Movants purchased 21.09 acres of land in Dauphin County, Pennsylvania, which they subsequently subdivided into two parcels.  One of these parcels is the Property, which, at the time the LSA was executed, consisted of "5.228 acres with house, barn, garage, 2 story chicken house, workshop, pole barn and grainery." (Exhibit " D-1"). Equipped with neither electrical

---

[2]Debtors would receive $95,567.75 through the following payments from Movants – an initial "deposit" of $15,000.00 and the remaining $63,000.00 through monthly payments of $451.35 for sixty months with a balloon payment of $53,486.75 at the end of the five years.

[3]The Written Summary provided that the rent for the Property was $900.00, but that Debtors would be permitted to pay "1/2 rent" ($450.00) for two years.

3

wiring nor a modern heat source, the house required substantial renovations when the parties

entered into the LSA in August 2006. Even before the LSA was executed, Movants had

approached Debtors about the possibility of improving the Property as a joint venture, and

Debtors agreed to their proposal. In furtherance of the venture, Debtors commenced work in

April 2006, painting the interior of the residence and making other improvements. Debtors

received no compensation from Movants for these improvements.

On August 31, 2006, Movants and Debtors executed the LSA, which "outline[d] the

general conditions of the sale" of the Property for $181,000.00. The LSA stated that Debtors

"agree[d] to purchase" the Property with "the following stipulations:" (1) a down payment of

$78,000.00 would be due on signing of the Sale Agreement; (2) Movants would hold a mortgage

for "the remaining . . . $107,000.00 . . . at the rate of eight and one half percent (8.5%) amortized

over twenty (20) years with a baloon (sic) payment for the balance of the contract amount in five

(5) years;"[4] (3) Debtors would "attempt to secure a loan from a commercial lender for the pay

off of this loan each year on the anniversary of this contract;" (4) the first payment of "the loan"

would be due on November 1, 2006; (5) transfer taxes would be divided equally between the

parties, and property taxes would be prorated; and (6) if Debtors defaulted on the LSA the

Property would be sold at the Movants' discretion, "loan to be settled first, equity of the buyers

to be paid from the balance of funds."

In accordance with the LSA, Debtors paid Movants $78,000.00 on August 31, 2006.

Debtors obtained the funds to make the down payment from the sale of the mobile home in

---

[4]A down payment of $78,000.00 on a sales price of $181,000.00 would leave a remaining
balance of only $103,000.00, not $107,000.00.

4

which they were residing. The "memo" line on the check states "Deposit on home 2599 Rt. 25, Millersburg, PA," which is the address of the Property. Movants cashed the check and deposited the funds.[5]

At trial, Debtors described the Property as an "Amish" home without electrical service and a heating system. In order to make the property habitable, Debtors installed electrical service at a cost of approximately $11,000.00.[6] Debtors also installed a coal stove and purchased major appliances. In total, Debtors expended between $26,000.00 and $31,000.00 to make improvements to the residence. Movants did not reimburse or otherwise compensate Debtors for these improvements.

At the time the parties executed the LSA, they understood that a second agreement would be drafted by Movants' attorney. Debtors believed that it was necessary for an attorney to draft the sales agreement in order to make the transaction "legal." Accordingly, Movants retained an attorney, Terrence Kerwin, Esquire, ("Kerwin"), who drafted the Lease/Option. Debtors executed the Lease/Option at Kerwin's office on December 5, 2006. They were not represented by counsel in this transaction, nor were they provided with a copy of the Lease/Option in advance. Neither Kerwin nor Movants were present at the time Debtors executed the Lease/Option, which they signed without reading its contents because they believed that it simply reiterated the terms of the LSA using appropriate legal terminology. The entire document, with

---

[5]The mortgage document referred to in the LSA was never prepared, transfer taxes were never paid or allocated between the parties, and the property taxes were never prorated.

[6]The time period in which these utilities were installed is not specified in the record, but Debtors introduced into evidence checks dated in July and September 2006 payable to Dew Electric, the contractor that performed the work. (Exhibit D-3)

the title "Lease with Lease/Option to Purchase" appearing prominently at the top of the first page, consists of five (5) pages, with Debtors' signatures appearing on the fifth page. The Lease/Option specifies a term of five years with a monthly rental payment of $1,063.86 beginning on November 1, 2006 and due on the first of the month thereafter. Before they signed the Lease/Option, Debtors made the first payment under the LSA, which was credited by Movants as the first payment under the Lease/Option. In the Lease/Option, Movants recharacterized the $78,000.00 paid by Debtors as a down payment for the purchase of the Property as consideration for the option to purchase.[7]

Shortly after the Lease/Option was signed, Movants entered into a loan and mortgage agreement with Halifax National Bank (the"Bank"). As collateral for the loan, Movants granted a mortgage on real property that included both the parcel they retained as well as the parcel transferred to Debtors in the LSA. In March 2007, at the request of the Bank, Debtors executed an agreement subordinating their interest in the Property to the Bank's mortgage.

---

[7]Paragraph 13 of the Lease/Option described the terms under which the option could be exercised.

> At the time of the execution of this document, [Debtors have] previously paid [Movants] a lump sum payment of Seventy-Eight Thousand Dollars ($78,000.00) in consideration for the [Movants] giving the Tenant an Option to Purchase this property . . . under the terms and conditions as follows: 1. [A] portion of the monthly [rent] payments . . . will be credited toward the purchase . . . under an amortization schedule which is attached hereto . . . . 2. To exercise the Option, the [Debtors] must notify the [Movants] in writing thirty (30) days prior to the anticipated settlement date. 3. The [Debtors] will pay all closing costs . . . and . . . fees needed to transfer the property . . . . 4. The property will be conveyed free and clear of all liens.

6

The parties have stipulated that Debtors made payments in the amount of $1,063.78 per month under the Lease/Option from November 2006 through September 2007, which were accepted by Movants.[8] Although Debtors eventually made all payments, they were not always timely. Debtors stopped making payments in October 2007, and no additional payments were made prior to petition filing date.

On February 14, 2007, Debtors received correspondence from Kerwin declaring them to be in default of the Lease/Option. The letter threatened Debtors with eviction if the default was not cured within ten (10) days. Movants did not take immediate action, but on January 22, 2008, Kerwin wrote to Debtors informing them that the "lease" had been terminated. The letter requested that Debtors vacate the premises.[9] On February 6, 2008 Kerwin notified Debtors that eviction proceedings were pending. On February 18, 2008, Kerwin again wrote to Debtors stating that "all agreements" that they had with "Mr. Davis" "are to be considered null and void." Kerwin further informed Debtors that Movants now considered them as tenants on a month-to-month lease. On April 14, 2008, Kerwin filed a landlord and tenant complaint in state court seeking a judgment for possession of the Property.

_____

[8]Linda Lee Schellhamer testified that the monthly payment amount was $1,063.78, but the Lease/Option Agreement states that the payment amount was to be $1,063.86. No explanation was provided by the parties for this discrepancy, but the difference is *de minimis* and has no bearing on the outcome of this case.

[9]The January 2008 letter stated that the last payment Debtors made to Movants was in September *2006*. This date, however, is obviously an error. The Stipulation of Facts states that the first monthly payment was made in November 2006 and the last payment prior to the filing of the bankruptcy petition was September *2007*.

7

In October 2007, Movants approached Debtors with the offer to rent the Property to Debtors at a reduced rate, to refund the $78,000.00 that had been paid under the LSA, and to compensate Debtors for the cost of making improvements to the Property. Debtors understood that the purpose of the offer was to enable Movants to "buy back" the Property. Movants prefaced their offer in the Written Summary by stating "I put this document together to explain what we want to do." The Written Summary then stated that Debtors' "rent" would be reduced from $1,063.86 to $900.00 per month, but that Debtors would be required to pay only $450.00, which would result in a total "savings" to them of $10,800.00 over two years. Through these "savings," Debtors would recoup the $11,000.00 that they expended to install electrical service on the Property. The Written Summary further provided that Movants would pay Debtors $63,000.00 over five years beginning with a deposit of $15,000.00, followed by monthly payments of $451.35 amortized over 20 years at 6 % with a balloon payment of $53,486.75 at the end of five years. After the recitation of the financial terms of the transaction, the Written Summary specified that if Debtors would "sign an agreement this week, [their] first payment [under the Written Summary] wouldn't be untill (sic) December first (sic) and no November payment would be needed." Debtors orally accepted the Written Summary in a telephone discussion a few days after Movants' offer was made and signed the Written Summary on October 20, 2007.

Debtors filed their bankruptcy petition on May 7, 2008. On schedule "A," Debtors stated that they held an interest as tenants by the entireties in the Property, which they valued at $181,000.00. They also reported that the Property was subject to a secured claim of $116,361.00. After Debtors filed for bankruptcy relief, Movants corresponded with Debtors' counsel, stating

8

that Debtors were in default of the Lease/Option and that Movants would request relief from the stay in the instant bankruptcy case unless Debtors cured the default within ten (10) days.  After the bankruptcy filing Debtors made payments to Movants of $1,063.78 for  June, July and August 2008.[10]

The motion at issue was filed on July 7, 2008.  A hearing was held on October 21, 2008.  Briefs have been filed and the matter is ready for decision.[11]

## Discussion

### I.        Standard for stay relief

The basis for Movants' request for relief from the stay is 11 U.S.C. § 362(d)(1), which enables the bankruptcy court to grant a creditor  relief from the automatic stay "for cause."  There is no dispute in this case that Movants are creditors of the Debtors.  Movants assert that they have "cause" for relief from the stay because Debtors' failed to pay rent as required under the Lease/Option before the petition was filed, and the default has not been cured.[12]

---

[10]The record contains no evidence regarding further payments from Debtors to Movants.

[11]I have jurisdiction pursuant to 28 U.S.C. §§157 and 1334.  This matter is core pursuant to 28 U.S.C. §157(b)(2)(G).  This Opinion constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is applicable to contested matters pursuant to FRBP 9014.

[12]The motion states that Movants have cause for relief from the stay because "Debtors have no equity in the [Property], as it was a Lease."  The motion further states that Movants' interest in the Property "is not adequately protected because the property is not being maintained as required under the [Lease/Option]."  Having introduced no evidence regarding the manner in which the Property is being maintained (or not being maintained),  Movants have abandoned the latter allegation.  Thus, Movants' cause for relief from the stay must arise from their allegation that Debtors have no equity in the Property.

9

"Initially, on a motion to lift or modify the automatic stay, the burden of proof is a shifting one. That is, section 362(d)(1) requires an *initial* showing of 'cause' by the movant, while section 362(g) places the burden of proof on the debtor for all issues other than 'the debtor's equity in property. . . . If the movant however fails to make an initial showing of cause, courts have denied relief without requiring any showing from the debtor that it is entitled to continued protection." *In re Telegroup, Inc*., 237 B.R. 87, 91 (Bankr. D. N.J. 1999) (italics in original) (citing *In re Holly's, Inc.,* 140 B.R. 643 (Bankr. W.D. Mich. 1992) (additional citations omitted)).

"[L]ack of adequate protection is the most common basis for granting relief for cause." *Telegroup*, 237 B.R. at 91(citing *Collier on Bankruptcy*, section 362.07[3][a] (15th ed.)). However, "'cause' has no clear definition and is determined on a case-by-case basis." *In re Tucson Estates, Inc.*, 912 F.2d 1162, 1166 (9th Cir. 1990) (citing *In re MacDonald*, 755 F.2d 715, 717 (9th Cir. 1985)). When a debtor fails to pay rent, but continues to occupy the leased premises, "cause" to obtain relief from the stay is established. *Zagata Fabricatrors, Inc. v. Superior Air Products*, 893 F.2d 624, 627-28 (3d Cir. 1990); *In re Rocchio*, 125 B.R. 345 (Bankr. D. R.I. 1991).

There is no dispute in this case that Debtors were delinquent in making the payments owed to Movants pre-petition, but the record is unclear as to the amount of the post-petition arrearages. Admitting that arrearages exist, Debtors' primary argument against Movants' allegations is that Debtors were not leasing the Property, but were purchasing it under the LSA. They assert that they have equity of at least $78,000.00 by virtue of the down payment they made when they acquired possession. Debtors admit that they signed the Lease/Option without reading

10

it because they assumed that it was simply a legally formalized reiteration of the terms of the LSA. They argue that they are not bound by the terms of the Lease/Option because they did not understand its contents when they signed it. Thus, the first issue to be addressed is which of the agreements, if any, bind the parties.

II.     *The elements of an enforceable contract*

Contracts are enforceable when parties reach a mutual agreement, exchange consideration and the terms of their bargain are sufficiently definite to be specifically enforced. *USA Machinery Corporation v. CSC, Ltd.,* 184 F.3d 257, 263 (3d Cir.1999); *Estate of Hall,* 731 A.2d 617, 621 (Pa.Super.1999); *Biddle v. Johnsonbaugh,* 444 Pa.Super. 450, 458, 664 A.2d 159, 163 (1995). *Accord Greene v. Oliver Realty, Inc.*, 363 Pa. Super. 534, 539, 526 A.2d 1192, 1194 (1987) ("a contract is enforceable when the parties reach mutual agreement, exchange consideration and have outlined the terms of their bargain with sufficient clarity").

Movants argue that the LSA was not a contract, but simply a "blueprint" for the bargain memorialized in the Lease/Option. By asserting that it was merely a proposal, Movants argue that the LSA did not include the essential terms necessary to form a contract. I disagree. All of the required elements for the formation of a contract are present in the LSA. Movants and Debtors discussed the terms of a sales agreement before the LSA was executed by the parties. A sale price of $181,000.00 was reached and, after some negotiation, the parties agreed on a down payment of $78,000.00. Drafted by Movants, the LSA constituted Movants' offer to sell the Property to Debtors for $181,000.00, with $78,000.00 due upon acceptance of the offer and the remainder to be paid through a mortgage Movants would hold for five years at a rate of 8.5% amortized over twenty years. Debtors accepted the offer by signing the LSA. Debtors partially

11

performed their obligations under the agreement by making the down payment and one monthly payment. Movants partially performed by transferring possession of the Property to Debtors. The terms of the LSA were sufficiently definite, the bargain was supported by consideration, and the parties manifested a mutual intent to be bound. Although not all terms necessary to perform the obligations under the contract were included (e.g., the monthly payment amount was not specified), the agreed upon terms were sufficient to form a binding agreement. *See Greene,* 363 Pa. Super. at 539, 526 A.2d at 1194 ("If an essential term is left out of the agreement, the law will not invalidate the contract but will include a reasonable term.") Therefore, each party was entitled to enforce the contract against the other even though both parties believed that a more formalized agreement was required. "If parties agree upon essential terms and intend them to be binding, 'a contact is formed even though they intend to adopt a formal document with additional terms at a later date.'" *Johnston v. Johnston,* 346 Pa. Super 427, 431, 499 A.2d 1074, 1076 (1985) (citing *Courier Times, Inc. v. United Feature Syndicate, Inc.*, 300 Pa. Super, 40, 54, 445 A.2d 1288, 1295 (1982)).

Approximately three months after the parties signed the LSA they executed the Lease/Option, which contained terms markedly different from those in the LSA. Thus, I must consider what effect the execution of the Lease/Option had upon the viability of the LSA. Specifically, I must determine whether by signing the Lease/Option, the parties effectively replaced the installment sales agreement with an agreement to lease the Property subject to an option to purchase.

### III. *Modification of contract*s

"[A] contract, once made, may be abandoned or modified at any time, but only with the consent of both parties." *Clarkson v. Crawford*, 285 Pa. 299, 304, 132 A. 350, 351 (1926);

Case 1:08-bk-01673-MDF   Doc 74   Filed 01/28/09   Entered 01/29/09 08:33:40   Desc
Main Document      Page 12 of 21

*Levicoff v. Richard I. Rubin & Co.*, 413 Pa. 134, 141, 196 A.2d 359, 361 (1964). Such consent

may be evidenced by "words or conduct." *Elliott v. Lindquist*, 356 Pa. 385, 388, 52 A.2d 180,

182 (1947). The words may be in the form of an offer, written or oral, to abandon or modify the

contract and acceptance of that offer. *Priester v. Milleman*, 161 Pa. Super. 507, 516, 55 A.2d

540, 545 (1947). Debtors admittedly signed the Lease/Option, but they assert that they should not

be bound by its terms because they believed it merely "legalized" the provisions of the LSA.[13]

While not conceding that the LSA established a contractual relationship between the parties,

Movants assert that even if the LSA were enforceable at one time, its provisions were

extinguished or modified by the execution of the Lease/Option.

> A.    *Is the Lease/Option enforceable against Debtors?*

Having determined that the LSA is an enforceable agreement, I now must determine

whether the Lease/Option was intended to modify the provisions of the LSA or, rather, intended

to serve as a substituted contract. Under Pennsylvania law, the LSA transferred equitable title to

Debtors upon execution. *See Stillwater Lakes Civic Assn., Inc. v. Krawitz*, 772 A.2d 118, 120

(Pa. Commw. Ct. 2001) (citing *Byrne v. Kanig*, 231 Pa. Super. 5431, 332 A.2d 472 (1974))

---

[13]Debtors admit that they did not read the Lease/Option before they signed it. Generally, parties attempting to extract themselves from a contract by asserting that they did not read it have found little sympathy in Pennsylvania state courts. "The fact that an individual has signed an apparently complete expression of the terms of a contract is strong evidence that he or she is thereby expressing his or her unconditional assent, and, unless there is some evidence to the contrary, it may be conclusive of his or her intention to be bound." *Daniel Adams Associates, Inc. v. Rimbach Pub., Inc.,* 360 Pa.Super. 72, 87, 519 A.2d 997, 1004 (1987) (citing 1 *Corbin on Contracts* § 31, at 117). "Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains." *Simeone v. Simeone*, 525 Pa. 392, 400, 581 A.2d 162, 165-66 (1990) (citing *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 305, 469 A.2d 563, 566 (1983) (failure to read a contract does not warrant avoidance or nullification of its provisions)).

13

(when installment sales agreement is signed, the buyer becomes the equitable owner of the property).[14] Contrary to Movants' "blueprint" argument, it is readily apparent that the Lease/Option was not the legal formalization of the bargain that was struck between the parties on August 31, 2006. Rather, the Lease/Option ignored the prior transfer and purported to extend to Debtors a mere lease with an option to purchase. In addition, the Lease/Option did not treat the $78,000.00 that Debtors had previously transferred to Movants as a down payment, as specified in the LSA, but as consideration for the option. Accordingly, I find that the Lease/Option did not simply modify the LSA. It was intended to serve as a new contract.

When a new contract is substituted for a pre-existing one and the earlier agreement is fully extinguished, the second agreement is termed a novation or substituted contract.[15] To constitute an effective substituted contract, the second agreement must: (1) displace and extinguish the obligations of a prior contract between the parties; (2) provide sufficient legal consideration for the new contract; and (3) be agreed to by the parties to the original contract. *Yoder v. T. F. Scholes, Inc.*, 404 Pa. 242, 245, 173 A.2d 120, 121-22 (1961). *First Lehigh Bank v. Haviland Grille, Inc.* 704 A.2d 135, 138-39 (Pa. Super. 1997); *Buttonwood Farms, Inc. v. Carson,* 329 Pa. Super. 312, 317, 478 A.2d 484, 486 (1984). The party that asserts the existence

---

[14]In an installment sales agreement the seller retains legal title to the property as security for the payment of the purchase price. *Stillwater Lakes Civic Assn.*, 772 A.2d at 120.

[15]At times, courts have used the terms "novation" and "substituted contract" interchangeably. The more contemporary view, however, is that a novation is a type of substituted contract in which one of the parties to the new agreement was neither the obligor nor the obligee of the original duty. *Refuse Management Systems, Inc. v. Consolidated Recycling and Transfer Systems, Inc.*, 448 Pa. Super. 402, 413, 671 A.2d 1140, 1145 (1996); Restatement (Second) of Contracts 280 (1979).

of a substituted contract bears the burden of demonstrating that the elements have been met. *First Lehigh*, 704 A.2d at 138-39 (citations omitted). *See also Atlantic Refining Co. v. United States*, 82 F.Supp. 201, 203 (E.D. Pa. 1948) (to abandon or modify contract, a new meeting of minds regarding abandonment or modification is required).

Movants argue that if the LSA is determined to be a binding contract, then the Lease/Option was entered into as a "substitute" for the LSA. While I agree that the parties intended that the Lease/Option would formalize the provisions of the LSA and would substitute for the earlier agreement, the Lease/Option has none of the elements required to create a substituted contract. First, Debtors received no consideration for renouncing the rights they obtained through the LSA. *See Commonwealth of Pennsylvania, Dept. of Transportation v. First Pennsylvania Bank, N.A.*, 77 Pa. Cmwlth. 551, 553, 466 A.2d 753, 754 (1983) (there can be no bargained for exchange if one of the parties already is legally bound to perform as promised). Second, although there was a signed agreement, the actions of both Debtors and Movants after execution of the Lease/Option demonstrate that neither party regarded Debtors as mere tenants.

The LSA explicitly required a "down payment"[16] of $78,000.00 on the total purchase price of $181,000.00. On August 31, 2006, Debtors performed their obligation under the LSA by making the required payment, and Movants accepted that performance. In November 2006, Debtors made at least one mortgage payment under the LSA. The Lease/Option provided no consideration to Debtors for their surrender of the equitable interest in the Property they obtained through the LSA. Movants no longer held equitable title to the Property at the time the

---

[16]Black's Law Dictionary defines the term "down payment" as "[t]he portion of purchase price which is generally required to be paid at time purchase and sale agreement is signed. . . ." *Black's Law Dictionary*, 6th Edition, 1990.

15

Lease/Option was executed; thus, any purported transfer of the equitable interest in the Property was a breach of the LSA. For this reason alone, the Lease/Option is not binding as a substituted contract.

Movants also were required to prove that the parties mutually agreed to rescind the LSA and substitute it with the Lease/Option. Movants assert that because the Lease/Option was a fully integrated written document signed by both parties, extrinsic evidence may not be considered to vary the terms of the agreement. The parol evidence rule precludes the introduction of extrinsic evidence of prior and contemporaneous negotiations and agreements of a subsequent written agreement. *Caplan v. Saltzman*, 407 Pa. 250, 254-55, 180 A.2d 240, 242 (1962). But the rule does not bar the introduction of extrinsic evidence of prior negotiations or agreements for the purpose of establishing that because of mutual mistake, a written agreement does not truly express the bargain struck by the parties. *McFadden v. American Oil Company*, 215 Pa. Super. 44, 52, 257 A.2d 283, 287-88 (1969) (citations omitted). Even if one party denies a mistake was made, a court may find that there was a mutual mistake. *Id.* Further, the parol evidence rule does not exclude the examination of the actions of parties after an agreement is executed.

Debtors established at trial that throughout the process they believed they were purchasing, not renting, the Property. The LSA, which was drafted by Movants, clearly indicates that a sale was intended. Although Movant Michael Davis' testimony at trial was sparse, he acknowledged that before the LSA was signed Debtors had "expressed a desire to have that piece of property when I said it was going to be offered for sale." He further stated that he agreed to lower the sale price from $239,000.00 to $181,000.00 because Debtors were willing to make "an up-front down payment." (N.T. 54) Davis further stated that he "wanted somebody in the place

16

that would take care of it, improve the value of it." (N.T. 55). In the Written Summary, which also was drafted by Movants, payments made by Debtors were referred to as "rent" rather than "payments," which suggests that Movants regarded Debtors as mere tenants. However, notwithstanding provisions in the Lease/Option that authorized Movants to retain the $78,000.00 payment in the event of a default of the Lease/Option, in the Written Summary Movants ignored this provision by offering to refund Debtors' "deposit" and by providing them a credit against future rent for prior improvements made to the Property. In summary, the actions taken by Movants themselves after the execution of the Lease/Option, unlike the communications of their attorney, are more in concert with those of a seller under an installment sale agreement than those of a landlord.

### B.  Was the Written Summary a novation of the LSA?

In the stipulated findings of fact the parties represent that "Movants had discussed *purchasing the property back* from the Debtors and told the Debtors that they could live for two years without making further payments. The Davises [Movants] gave the Debtors a written summary of the agreement."  (emphasis added) Stipulation of Facts, #15.  The Court finds that this statement is an admission that Movants believed that they had sold the Property to Debtors. Although not specifically stipulated to by the parties, the Written Summary memorialized this understanding.

Having determined that Movants sold the Property to Debtors, the remaining issue is whether the Written Summary rescinded or modified the obligations of the LSA. The first line of the Written Summary states that the document is intended to explain what "we want to do." After setting forth the proposed financial arrangements, Movants state in the document that "[i]f you

17

sign an agreement this week your first payment wouldn't be untill [sic] December first and no November payment would be needed. It will take the lawyer some time to put together contracts for the deposit funding and for me to get a loan for the $15,000 [the initial repayment of Debtors' down payment]."

An offer capable of being accepted by the offeree is distinguished from the preliminary negotiations that may lead to an offer. *Upsal Street Realty Co. v. Rubin*, 326 Pa. 327, 329, 192 A. 481, 482 (1937). The Written Summary contained the necessary elements of an offer, which was accepted by Debtors. The parties reached a mutual agreement to undo the sales agreement, they exchanged consideration,[17] and they outlined the terms of their bargain with sufficient clarity. However, the Written Summary was not a substituted agreement for the LSA, it was an executory accord, which provided that the claims the parties had against each other under the LSA would be discharged by future performance. Because the performance of an executory accord is required before the obligations of the prior contract are discharged, the LSA remained in effect until the terms of the executory accord were performed. However, neither party performed under the executory accord. Movants did not transfer $15,000.00 to Debtors as a "deposit" on the repurchase or make the $451.35 per month payments that the Written Summary required. Similarly, Debtors did not pay Movants $450.00 (or any other sum) as specified in the Written Summary. Neither party, however, notified the other of a default or treated the agreement as having been breached. Accordingly, I must determine whether the Written Summary was in force on the date that Debtors filed their bankruptcy petition.

---

[17]An agreement to compromise a dispute is sufficient consideration to support a contract. *Cohen v. Sabin*, 452 Pa. 447, 307 A.2d 845 (1973).

18

*C.  Status of the Written Summary on the date of the bankruptcy petition.*

The pleadings and testimony at trial demonstrate that neither party is seeking to enforce the Written Summary in this litigation, just as neither sought to enforce it pre-petition.  The failure of both parties to perform their obligations under that Agreement indicates a mutual intent to abandon or rescind it.  "A rescission amounts to the unmaking of a contract, and is not merely a termination of the rights and obligations of the parties towards each other, but is an abrogation of all rights and responsibilities of the parties towards each other from the inception of the contract. It is a form of retroactive relief."  *Metropolitan Property and Liability Ins. Co. v. Com.*, 97 Pa. Cmwlth. 219, 223, 509 A.2d 1346, 1348 (1986).  "[An] agreement to rescind need not be expressed in words; it may be inferred from the acts and declarations of the parties inconsistent with the existence of the original contract."  *Weldon & Kelly Co. v. Pavia Co.*, 354 Pa. 75, 79, 46 A.2d 466, 468 (1946) (citing *Brentwood Realty Company v. Moses*, 73 Pa.Super. 307, 312 (1919)).

In the instant case, Movants rescinded their offer to reach an accord when they failed to obtain the financing that would have enabled them to make the $15,000.00 down payment required by that Agreement.  The rescission became mutual when Debtors failed to make the $450.00 monthly payment to Movants as specified in the Written Summary. Because the Written Summary was an executory accord and not a substituted contract, the LSA remained the binding agreement between the parties when the Written Summary was rescinded.

IV.     *Movants' request for relief from the stay*

On the date of the filing of the petition Movants held a mortgage against the Property, and Debtors were obligated to make monthly payments.  Debtors are required to pay the balance due on the agreement on or before August 31, 2011. There is no dispute in this case that on the date

19

Debtors filed their bankruptcy petition they were in arrears on the payments due under the LSA. "[T]he continued failure to tender periodic payments to a secured creditor pursuant to the terms of an underlying loan may constitute 'cause' for relief under § 362(d)(1)." *In re Panas*, 63 B.R. 637, 638 (Bankr. E.D. Pa. 1986) (pre-petition and pre-confirmation defaults on residential mortgage loan provided cause for relief from stay) (citations omitted). However, the "failure to make payments, standing alone . . . does not usually constitute "cause" to modify or lift the stay. . . [w]hen there is still equity in the collateral. . . ." *In re Nichols*, 440 F.3d 850, 856 (6th Cir. 2006) (citing *In re Mathews*, 208 B.R. 506, 511 n. 6 (Bankr. N.D. Ala. 1997)); *In re Raymond*, 99 B.R. 819, 822 (Bankr. S.D. Ohio 1989). A substantial down payment at the time of purchase of real property may create an "equity cushion." *In re Sacko*, 394 B.R. 90, 106 (Bankr. E.D. Pa. 2008).

In the within case, Debtors made a $78,000.00 down payment on a purchase price of $181,000.00 – 43% of the total amount due. Both before and after the parties entered into the LSA Debtors made improvements to the Property.[18] Therefore, Movants interest in the Property for the balance of the purchase price is protected by the equity cushion created by the down payment and the increased value of the Property attributable to the improvements. This cushion protects Movants' interest in the Property from diminution during the pendency of the bankruptcy case as long as the value of the Property clearly exceeds the amount of the claim. *See In re Liona Corp., N.V.*, 68 B.R. 761 (Bankr. E.D. Pa. 1987). "To the extent that the cushion is small, it may not be sufficient to constitute adequate protection" under § 362(d)(1). *Id.* at 767

---

[18]No evidence was offered as to whether the improvements increased the value of the Property, but the Written Summary admits that Debtors' additional "investment" in the Property was $10,800.00.

("seven percent equity cushion will rarely provide sufficient protection . . . ."). However, based on the record before me, I am unable to find that Movants are not protected by an equity cushion or that they otherwise are entitled to relief.[19] Therefore, their motion will be denied.

An appropriate Order will be entered.

By the Court,

*Bankruptcy Judge*

*This document is electronically signed and filed on the same date.*

Date: January 28, 2009

---

[19]The Court recognizes that the Property was pledged as collateral for a mortgage between Movants and the Bank, recorded on December 29, 2006, while it was subject to the unrecorded sales agreement between Debtors and Movants. In this Opinion the Court does not address the rights of Halifax National Bank in the Property and, specifically, the application of the Pennsylvania Recording Act, 21 P.S. §351.

21